# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 15, 2014 Session

## STATE OF TENNESSEE v. JAMES MURRAY WASHINGTON

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-C-2638       Monte Watkins, Judge**

---

**No. M2013-00831-CCA-R3-CD - Filed March 31, 2015**

---

The appellant, James Murray Washington, was convicted by a jury in the Davidson County Criminal Court of first degree murder.  The trial court sentenced the appellant to life imprisonment without the possibility of parole.  On appeal, the appellant contends that the evidence was not sufficient to sustain his conviction, that the trial court erred by denying a motion to suppress his statement to the police, and that the trial court violated his constitutional right to confrontation by allowing a doctor who did not perform the victim's autopsy to testify regarding the autopsy and by admitting the autopsy report into evidence. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined.  THOMAS T. WOODALL, P.J., filed a concurring opinion.

Richard C. Strong (on appeal) and Newton Holiday and Ashley Preston (at trial), Nashville, Tennessee, for the appellant, James Murray Washington.

Robert E. Cooper, Jr., Attorney General and Reporter, Michelle L. Consiglio-Young, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Hugh Ammerman and Rob McGuire, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

In 2009, the appellant was charged with first degree murder for the 1995 death of the victim, Joyce Dean Goodner, after he made a statement implicating himself in the killing.

Prior to trial, he filed a motion to suppress, alleging that the incriminating statement was not knowing and voluntary because it was made without the benefit of Miranda warnings while he was hospitalized, in state custody, and under the influence of medication.

DeWayne Steven McKinney, a Walgreens' pharmacist, was the sole witness at the suppression hearing. He was called to testify as an expert regarding the side effects of the medication the appellant was taking. The trial court did not allow McKinney to testify as an expert witness but did allow him to testify as a lay witness. McKinney testified that defense counsel asked him to review the appellant's medical records, which were admitted by stipulation. McKinney stated that according to the records, the appellant had been prescribed diltiazem and lisinopril for blood pressure and Haldol, an anti-psychotic medication for treating schizophrenia or bipolar disorder. He said that the Physician's Desk Reference (PDR) listed hallucinations as one of the least common side effects of diltiazem and Haldol.

After McKinney's testimony, both parties presented arguments to the court. Defense counsel, citing the appellant's medical records, stated that in 2009, the appellant was taken from Turney Center State Penitentiary to Nashville General Hospital for treatment of his seizures On the return trip, the appellant had "a full psychotic episode. He start[ed] seeing things, start[ed] talking to people that are not there, and things of that nature." Afterward, the appellant was transported to DeBerry Special Needs Facility, where he remained for forty-five days and was diagnosed as psychotic. Defense counsel argued that the appellant "was not in his right state of mind where he could give a voluntary, knowingly confession to anyone."

The State argued that the evidence at the hearing did not show that the medications administered to the appellant did anything other than "help him be in an appropriate state of mind and lower his blood pressure." The State contended that the appellant was asking the court "to make a pre-trial determination as to the credibility of the [appellant's] admission, or statement, at the time it was heard by the witnesses," which, according to the State, was an issue for the jury to determine. The trial court held that the appellant's statement was voluntary and that no evidence was presented to show that the statements "were made with any State involvement." Accordingly, the court denied the motion.

Thereafter, the case proceeded to trial. The proof adduced during the State's case-in-chief revealed that around 11:10 or 11:15 a.m. on July 5, 1995, James Roy Smothers, III, and his sixteen-year-old stepson were driving toward Nashville when they noticed smoke coming from an abandoned house at 4522 Ashland City Highway. Smothers parked near the highway, and they approached the house on foot. No vehicles were parked around the house. They entered the house through a window that had no glass. Smothers said that the amount of smoke in the house made it difficult to see; however, they found some rugs that appeared to be burning. They lifted a mattress, intending to place it on top of the rugs to extinguish the

fire. They stopped, however, when they saw the legs and hand of the victim's body protruding from the rugs. Smothers and his stepson left the house and called 911. The call was placed at 11:33 a.m.

Around noon, Metro-Nashville Police Department ("Metro") crime scene investigator Wayne Hughes and Officers Charles Anglin and William Merrell were dispatched to process the crime scene. The victim's body was inside the house and was rolled up in a rug. The victim's arm was sticking out of the rug, and a bloodstained cinder block was lying on her head. The victim's body and the rug appeared to have been doused with an accelerant. Blood was splattered along the wall beside the body, and the room had suffered extensive damage from the fire. Testing of the blood on the cinder block revealed a partial DNA profile consistent with the victim's DNA.

The same day the victim's body was discovered, Investigator Grady Eleam and his partner, Sergeant Anna Marie Williams, were assigned to investigate the case. They spoke with the victim's boyfriend, Luther Winn. He stated that he had last seen the victim at 2:00 a.m., before he went to work. Winn told the officers that the appellant may have been with the victim on the day of her death. The officers confirmed that Winn had an alibi for the crime because he was at work from 3:30 a.m. until 12:30 p.m. They learned later that the appellant was scheduled to work on July 3, 4, and 5, but he did not show up.

On July 6, 1995, Lisa Cowell contacted the police after hearing about the murder. She said that she had driven past the abandoned house at approximately 10:30 a.m. the day before and had noticed a dirty, black Camaro in the driveway. She could not see the vehicle's license plate number, but she saw the silhouette of a person inside the house. She assumed the person was male because of the person's height and build. When she drove by at 11:00 a.m., the car was gone.

On July 24, 1995, Investigator Eleam showed Cowell photographs of the appellant's brother's Camaro. She stated that the vehicle in the photograph was consistent with the vehicle she saw at the abandoned house. Although the police searched the abandoned house and the Camaro, they found no evidence that connected the appellant to the victim's murder.

Investigator Eleam spoke with the appellant's girlfriend, Roslen Beard Butler, on July 10. Butler said that the appellant had lived with her for two and one-half years. Butler said that on July 5, the appellant left for work at 6:30 a.m. When Butler came home from work, he told her he had left work around noon. Butler said that she asked the appellant on July 8, 1995, to leave her house because of his involvement with drugs, and he went to live with his mother. Butler said that the appellant drove a black and gray Chevrolet Camaro that he had borrowed from his brother with the intention of buying it. However, the appellant's brother

repossesed the car shortly after July 10, 1995.

On July 10, the appellant, after hearing about the murder, went to police headquarters for an interview and gave the following written statement about the events of July 5, 1995:

> [I] got up about 5:00 a.m.[,] got ready to go to work, finished about 5:45 a.m. Left for work about 6:05. Noticed it might rain, went to Southern Hills where we were working[. I]t was spot raining along the way[.] I reached work about 6:28 a.m. and decided not to work that day []because[] it started raining harder[.] I s[a]t in the parking lot for about 10 min[utes] and left[.] I went to 10th [A]ve[nue N]orth[,] it took me about 45 min[utes] to get there traveling down Nole[n]sville R[oa]d. When I got there[,] a girl name[d] Lucy and I smoked some Ready Roc for about 35 min[utes]. I left and went over to Red[']s house[.] [A]long the way[,] I ran out of gas, so I walked to La-La[']s[<sup>1</sup>] house and asked her did she have a gas can, and l[oan] me a few dollars[. S]he said she didn't have either, so I walked and found a can, and got 2.00 dollars worth of gas[.] I guess it was somewhere around 9:00 a.m. or so, I drove back to 10th Ave[nue] North []and[] then I saw []Joyce[] come out of Henry's house[. S]he said are you doing anything[?] I said yes[.] I had about a 20 cent p[ie]ce of Ready Roc[.] I gave her half for "sex" and I smoked the rest. We had sex in a[n] alley off of 10th [Avenue]. I drove back down to Henry[']s house[.] Joyce got out[] and said she would be back in about 30 min[ute]s[.] I waited at [H]enry's house[. S]he said someone was going to pay her for washing cloth[e]s[. S]he didn't come back [for] almost an[] hour[.] I waited for about 45 min[utes.] I left and went home. Lucy was on the wall when I le[ft.] I waved & went home. []I told Henry to tell Joyce I would see her later. Went home[,] showered[,] and looke[d] at T.V.[,] ate[,] and went to sleep.

Sergeant Williams said that during the interview, the appellant did not appear intoxicated and gave no indication that he suffered from any mental deficiency. She noted that it should not have taken the appellant forty-five minutes to travel from Southern Hills to North Nashville via Nolensville Road.

---

[1]Sergeant Williams said that "La-La" was Bernice Riley.

No new developments occurred in the case until March 3, 2009, when the appellant, who was incarcerated at Turney Center for another offense, was transported to Nashville General Hospital. Officer James Tomlinson and Corporal Homer Lee Carey supervised the transport. During the trip, the appellant never appeared to be in "medical distress," and he did not yell or scream.

Upon arrival at the hospital, the appellant was assigned a room. Officer Tomlinson testified that around lunchtime, the appellant gestured for him to come into the room and said, "I've got something to tell you. . . . I've got something I need to get off my consc[ience]. I have killed somebody." Officer Tomlinson responded, "Well, okay, you did." The appellant said, "Yes, I beat her to death." Officer Tomlinson went into the hall and asked Corporal Carey to come into the room.

Corporal Carey testified that the appellant said, "Officer, . . . I want to confess something to you." Corporal Carey asked, "What do you want to confess? What you are in for now?" The appellant replied, "No, sir. . . . I want to confess about killing a girl." Corporal Carey asked, "You did?" The appellant responded, "Yes, sir. . . . I feel I need to confess." Corporal Carey said, "Well, . . . [y]ou're confessed – you're confessing to that. . . . Who was she?" The appellant answered, "'Joyce' somebody." Corporal Carey thought the appellant said the victim's last name was "Good something." Corporal Carey and Officer Tomlinson each made a note of the conversation, stating that the appellant had admitted murdering Joyce "Goodner" or "Goodman" near "Ashland City" around 1991. Although the officers did not know whether the appellant had taken any medication that day, they said that when he confessed, he "seemed pretty calm," did not show any signs of agitation, and did not appear to be having hallucinations. Corporal Carey believed the appellant made the confession because "he thought he was really sick" and wanted to clear his conscience.

Dr. Thomas Deering, a forensic pathologist, testified that the victim's autopsy was performed by Dr. Bucholtz in 1995. Dr. Deering said that he had reviewed the autopsy report, and it was entered as an exhibit to his testimony. When asked if he agreed with Dr. Bucholtz's findings, Dr. Deering said, "I agree with the two major opinions that we do as forensic pathologists, and that is answering the questions what's the cause of death and what is the manner of death."

Dr. Deering noted that the report stated that when the victim's body arrived at the medical examiner's office, it was partially burned and rolled in a rug. One of the victim's hands was sticking out of the rug. According to the report, the victim had suffered a "series of blunt force injuries" to the head, which caused bleeding inside the brain. Dr. Deering opined that a brick or a block could have caused the blunt force injuries. He stated that the blows would have rendered the victim unconscious and, in time, would have been fatal. The

report stated that the victim had two stab wounds on the left side of the neck, which would have bled significantly and would have eventually been fatal. Testing revealed no carbon monoxide in the victim's blood, which indicated that the burning occurred after she was dead. The toxicology report reflected that cocaine was found in the victim's blood. No semen was found on or inside the victim; however, Dr. Deering stated that the fire may have destroyed evidence.

On cross-examination, Dr. Deering said that he frequently had to "review some other doctor's work and to come in and testify about it." Dr. Deering said that based upon the findings in the report, he agreed with Dr. Bucholtz's conclusion that the cause of death was blunt force trauma with stab wounds and that the manner of death was homicide.

The appellant did not testify in his defense. A copy of his medical records was introduced by stipulation.

Dr. Otis Campbell, the medical director at Turney Center, testified as an expert in pharmacology and internal medicine. Dr. Campbell said that on March 3, 2009, the appellant reported having seizures. When Dr. Campbell saw the appellant, he appeared lethargic and drowsy but did not appear to be suffering from hallucinations. The appellant was not given any medication and was placed in an ambulance for transport to Nashville General Hospital. Dr. Campbell said that the appellant was taking aspirin; Cardizem, a brand name for diltiazem; hydrochlorothiazide; and lisinopril. Dr. Campbell said that a severe side effect of Cardizem was hallucinations. He said that the appellant had reported no hallucinations since May 2009.

Pharmacist DeWayne McKinney testified regarding the potential side effects of the medications the appellant was taking. McKinney stated that hallucinations were one of the least common side effects of diltiazem. McKinney said that according to the appellant's medical records, he was first prescribed diltiazem on January 30, 2009, and he took the drug for approximately six months. McKinney acknowledged that he would "have expected to see more than one hallucinatory event during the period of, approximately, six months that the [appellant] was on this medication." Nevertheless, he did not find a single hallucinatory event to be suspicious.

McKinney said that in addition to the diltiazem, the appellant had been prescribed low dose aspirin; hydrochlorothiazide, a diuretic; and lisinopril, which treated high blood pressure. McKinney said that the medications could have interacted and caused the hallucinations. McKinney did not know of any potential hallucinatory side effects from lisinopril or the diuretic.

Dr. Renee Lavan Glenn, a licensed psychiatrist, testified for the State on rebuttal. Dr. Glenn testified that after the appellant arrived at DeBerry, she examined him for a possible psychiatric condition. When Dr. Glenn met with him, the appellant was shaking and appeared agitated. He told Dr. Glenn that he was hearing voices and expressed "suspicious . . . or paranoid ideas." Dr. Glenn recommended that the appellant be transferred to the acute psychiatric unit for further evaluation.

Dr. Glenn said that during his stay, the appellant was observed "on an irregular basis." Dr. Glenn noted that the appellant's symptoms were greater when he knew he was being observed than when he was unaware of the observation. The appellant was officially admitted to DeBerry on March 4, 2009, and he was discharged on April 1, 2009. He was diagnosed with delirium, a state of confusion that generally cleared up over time.

Dr. Glenn said that she was unaware during her assessment that the appellant had confessed to murder. She conceded that it was relatively easy to malinger hallucinations and that a person might do so "to cloak a statement that he wished to recant." Dr. Glenn acknowledged that the specificity of the appellant's confession differed from typical hallucinations. She said that the confession could have been a delusion, which was a "fixed false belief." She noted, however, that delusions were generally elaborate and that the appellant's statement was more "matter of fact; [like] he was trying to reach some kind of goal in reporting that." She could not determine whether the appellant's statement was accurate, based upon a delusion or hallucination, or whether the appellant was malingering.

The jury found the appellant guilty of first degree murder, for which the trial court imposed a sentence of life without the possibility of parole. On appeal, the appellant contends that the evidence was not sufficient to sustain his conviction of first degree murder, that the trial court erred by denying his motion to suppress his statement to the police, and that his right to confrontation was violated by the testimony of Dr. Deering and by the admission of the autopsy report.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In order to obtain the appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the appellant's prior relationship to the victim which might suggest a motive for the killing; (2) the appellant's declarations of intent to kill; (3) the appellant's planning activities before the killing; (4) the manner of the killing, including the appellant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the appellant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See Pike, 978 S.W.2d at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In Tennessee, a guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The appellant, citing State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971), contends that because his convictions are based solely upon circumstantial evidence, "the facts and circumstances must be so strong and cogent as to exclude every other reasonable hypothesis except that the [appellant] is guilty." However, well before the appellant's brief was filed, the Crawford standard for evaluating circumstantial evidence was overruled by our supreme court's opinion in State v. Dorantes, 331 S.W.3d 370 (Tenn. 2011). In Dorantes, our supreme court stated that the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See Dorantes, 331 S.W.3d at 379. Therefore, when based solely on circumstantial evidence, the evidence need not remove every reasonable hypothesis except that of guilt.

The appellant also contends that in Tennessee, all homicides are presumed to be second degree murder. We remind the appellant that the presumption of second degree murder was abolished in 2005 by our supreme court's opinion in State v. Jackson, 173 S.W.3d 401 (Tenn. 2005). In Jackson, our supreme court explained:

> The presumption that a homicide is second degree murder is based on common law and was codified in Tennessee Code Annotated section 39-2-211(a) (1988). . . . The codified presumption of second degree murder has since been repealed. Acts 1989, ch. 591, section 1.
>
> In 1989, the legislature revised the criminal statutes, abolishing all common law offenses and replacing them with statutory offenses. . . . Under the current statutory scheme, the presumption is no longer applicable and is, therefore, obsolete.

Id. at 406-07.

The appellant also argues that the State failed to sufficiently prove premeditation. We disagree. The proof at trial revealed that the appellant confessed to killing a woman named Joyce, whose last name may have been Goodman, in Ashland City around 1991. The appellant said that he beat her to death. Moreover, the appellant acknowledged in a statement to police that he was with the victim on the morning of July 5, 1995, and that he paid her for sex. Later that morning, the victim's body was found in an abandoned house, wrapped in a rug that had been doused with an accelerant and set on fire. A bloodstained cinder block was lying on the victim's head. The proof at trial established that the victim's death was caused by multiple blunt force blows and multiple stab wounds. We conclude that a jury could have found these facts sufficient to establish premeditation.

The appellant also contends that the State failed to prove his identity as the perpetrator. Again, we disagree. The proof at trial revealed that around 10:30 a.m. on July 5, 1995, a dirty, black Camaro was parked at an abandoned house on Ashland City Highway. In the window of the house, Lisa Cowell saw the silhouette of a person who she assumed was a male. When she drove by at 11:00 a.m., the car was gone. Cowell was shown a photograph of the Camaro the appellant had been driving around that time, and she asserted that the Camaro in the photograph was "consistent" with the one she saw at the abandoned house. An autopsy revealed that the victim's death was caused by multiple blunt force trauma and multiple sharp force trauma. Shortly after the victim's death, the appellant told the police that he saw the victim around 9:00 a.m. on the morning of her death and that he paid her for sex. Years later, on March 3, 2009, the appellant was taken to the hospital, and he confessed to two officers

that around 1991, he killed a woman named Joyce in Ashland City and that he wanted to clear his conscience. The officers were unclear about the victim's last name but believed the appellant said "Goodman." We conclude that from the foregoing, the jury could have found that the appellant killed the victim and that the evidence is sufficient to support the conviction.

## B. Suppression of Evidence

Next, the appellant challenges the trial court's denial of his motion to suppress his statement to police that he killed a woman named Joyce in Ashland City around 1991. In his motion, the appellant asked to suppress the statement he made while he was hospitalized and "under the influence of medication and/or the side effect of said medication, in addition to the seizure which caused the [appellant's] mental state to be altered at the time said self-incriminating statement [was] made." The motion stated that the contested statement was attached, but no such attachment is in the record.

At the suppression hearing, the State submitted no proof. Defense counsel presented the pharmacist's testimony and the appellant's medical records, which stated that while the appellant was hospitalized for seizures, he reported having hallucinations and had a "full psychotic episode." Defense counsel said that the medical records, along with the testimony of McKinney, established that the appellant's statement was not knowing and voluntary due to the effects of the medications he was taking. The appellant further argued that his statement was the result of custodial interrogation and that prior to his statement, he should have been advised of his Miranda rights.[2] Conversely, the State contended that the appellant presented no proof that the statement was made during a custodial interrogation and under circumstances requiring that he be given Miranda warnings. The State also argued that the proof presented did not address whether the statement was voluntary in the context of Miranda. The State noted that the only proof was from a pharmacist regarding the potential side effects of the appellant's prescribed medication. The State asserted that the issue raised by the appellant was not whether his statement was involuntary in the context of Miranda but was, instead, a question of whether the appellant's statement was the product of hallucinations caused by his medications and therefore was not trustworthy. The State asserted that the trustworthiness of the statement was an issue for the jury to determine.

In its April 5, 2012 written order denying the motion, the trial court stated:

> The [appellant] did not present any evidence that the statements
> were made with any state involvement. The court was not
> presented with what the statements were nor who the statements

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

were made to. Therefore, the Court finds that the [appellant's] statements were voluntarily [made] and are admissible.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

On appeal, the appellant first contends that the trial court erred by shifting the burden of proof to the appellant to show that the statement was admissible. In response, the State contends that the appellant "voluntarily undertook the burden of production." The record supports the State's contention. We note the State bears the burden of demonstrating by a preponderance of the evidence that the appellant's statements were voluntarily, knowingly, and intelligently made. State v. Kelly, 603 S.W.2d 726, 728 (Tenn. 1980). Nevertheless, when filing a motion to suppress, "it is the defendant's obligation to identify the relief sought and the grounds therefor" and to "'identify[] the items he [seeks] to suppress.'" State v. Coulter, 67 S.W.3d 3, 39-40 (Tenn. Crim. App. 2001) (quoting State v. Johnson, 705 S.W.2d 681, 683 (Tenn. Crim. App. 1985)). The appellant failed to meet this obligation because he never provided the court with the specific statements he sought to suppress. Further, at the suppression hearing the appellant did not raise the issue of the burden of proof being shifted to him. State v. Archie Hill, No. 01C01-9201-CC-00041, 1992 Tenn. Crim. App. LEXIS 881, at *8 (Nashville, Nov. 18, 1992). Indeed, at the beginning of the hearing, defense counsel said, "[T]his is [the appellant's] motion to suppress. My first witness is DeWayne McKinney." The appellant also did not specifically raise this issue in his motion for new trial and alleged only in general terms that the trial court erred by denying his motion to suppress. Therefore, we conclude that this issue is waived. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

Next, the appellant contends that the trial court should have suppressed any statements

-11-

he made while he was hospitalized, in the State's custody, and suffering from hallucinatory side effects of his medication. The State responds that the pharmacist's testimony and the appellant's medical records do not relate to the voluntariness of the statement, only the statement's trustworthiness. The State further responds that the trustworthiness of the statement is an issue for the jury to determine.

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." These procedural safeguards require that police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. State v. Sawyer, 156 S.W.3d 531, 534 (Tenn. 2005). If these warnings are not given, statements elicited from the individual may not be admitted in the prosecution's case-in-chief. Stansbury v. California, 511 U.S. 318, 322 (1994). The requirement that Miranda warnings be given is triggered only when a defendant is (1) in custody and (2) is subjected to custodial interrogation. See Walton, 41 S.W.3d at 82; see also Colorado v. Connelly, 479 U.S. 157, 164-66 (1986).

First, we must determine whether the appellant was "in custody" at the time he made the statement. The State concedes that the appellant, as an inmate, was in the custody of the State at the time his statement was made. Nonetheless, the State notes that the appellant was not in custody for the instant crime; he was, instead, in the hospital for medical treatment. This court has previously observed that being in custody on another charge does not automatically trigger the "in custody" portion of the Miranda requirement. State v. Goss, 995 S.W.2d 617, 628 (Tenn. Crim .App. 1998). In fact,

> [A]n inmate is not in custody for Miranda purposes unless there is an added imposition on the inmate's freedom of movement. Relevant to this determination is (1) the language used to summon the inmate, (2) the physical surroundings of the interrogation, (3) the extent to which he is confronted with evidence of his guilt, and (4) the additional pressure exerted to detain the inmate. . . . [T]his standard is best suited to determine whether Miranda warnings must precede questioning in a prison setting, given the fact that a prisoner would always believe that he was not free to leave the prison.

Id.

In the instant case, the appellant was not summoned for questioning. Instead, he summoned the officers, initiated the conversation, and was not confronted by "evidence of his guilt." Therefore, it is questionable as to whether the appellant was "in custody" for the purposes of Miranda.

Next, we will determine whether the statement was made as the result of an interrogation. "Interrogation 'refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" Sawyer, 156 S.W.3d at 534 (quoting Rhode Island v. Innis, 446 U.S. 291, 298 (1980)). Additionally, interrogation consists of "any 'practice that the police should know is likely to evoke an incriminating response from a suspect.'" Id. However, "[t]here is a difference between police initiated custodial interrogation and communications, exchanges, or conversations initiated by the accused himself." State v. Land, 34 S.W.3d 516, 524 (Tenn. Crim. App. 2000). Such communications, when initiated by the accused, are "not interrogation in the Innis sense." Id.

The proof adduced at the suppression hearing and at trial revealed that the appellant was hospitalized after he suffered seizures. While at the hospital, the appellant initiated contact with the corrections officers, stating that he wanted to confess to clear his conscience. He told the officers that he had murdered a woman named Joyce in Ashland City around 1991. The officers asked some follow-up questions; specifically, one of officers said that he had difficulty understanding the victim's last name. Accordingly, there is no proof in the record to suggest that the questions were for the purpose of finding incriminating material. See Sawyer, 156 S.W.3d at 534. The appellant adduced proof that he was taking medication that potentially could cause hallucinations but adduced no proof that he was having hallucinations at the time of his statement. Indeed, the evidence adduced by the State established that at the time the statement was made, the appellant appeared lucid and did not exhibit any signs of hallucinations until the officers had left. Therefore, we conclude that the statement was not made as the result of a custodial interrogation, that Miranda warnings were not required, and that the trustworthiness of the statement was a question for the jury. Accordingly, the record does not preponderate against the trial court's finding that the statement was admissible.

## C. Confrontation Clause

The appellant's final issue concerns the admission of the autopsy report and testimony of Dr. Deering about the report. At trial, Dr. Deering testified that Dr. Bucholtz performed the autopsy on the victim in 1995. Dr. Deering testified that he had reviewed the autopsy report, Dr. Bucholtz's findings, and the autopsy photographs, and that he agreed with Dr. Bucholtz's conclusions regarding the cause and manner of the victim's death. On cross-

-13-

examination, Dr. Deering said that he frequently reviewed and testified about other doctors' "work."

The appellant contends that admitting the autopsy report and allowing Dr. Deering to use it to reach a conclusion about the victim's death violated his Sixth Amendment right to confront witnesses in two ways. First, he complains that the trial court should not have allowed the autopsy report to be entered as an exhibit without the testimony of the doctor who prepared it. Second, he asserts that the trial court should not have allowed Dr. Deering to testify about the report and give an opinion as to the cause and manner of death when he did not perform the autopsy or prepare the report. The appellant acknowledges that he failed to object to the admission of the autopsy report or to Dr. Deering's testimony, but he argues that he is entitled to relief because the admission of the report and the testimony was plain error. See Tenn. R. App. P. 36 ("When necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). The State contends that the appellant waived the issue by failing to object and that he is not entitled to plain error relief.

We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks and citation omitted).

In Tennessee, criminal defendants are entitled to confront witnesses against them under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. The exercise of the right to confront "is controlled by the trial judge," and "the trial court's decision will be upheld absent an abuse of discretion." State v. Rice, 184 S.W.3d 646, 670 (Tenn. 2006) (internal quotation marks and citation omitted).

In Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court analyzed the Sixth Amendment right to confrontation and drew a distinction between the admission of testimonial and nontestimonial hearsay. The Court explained that the admission of nontestimonial hearsay is exempt from Confrontation Clause scrutiny; however, the "Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination" for the admission of testimonial hearsay. Id. at 68. However, the Court "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial.'" Id.

Thereafter, in Davis v. Washington, 547 U.S. 813, 822 (2006), the Supreme Court adopted "the primary purpose test" and explained that

> [s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Recently, our supreme court addressed an appeal regarding the admissibility of autopsy reports prepared by a medical examiner who did not testify and the admission of testimony from a physician who did not perform the autopsy. State v. Dotson, 450 S.W.3d 1 (Tenn. 2014). Our supreme court acknowledged that "[c]ourts continue to be divided on the question of whether autopsy reports are testimonial statements or not." Id. at 71. Moreover, the court observed that Dotson failed to object to the doctor's testimony, did not contest the cause of death or any of the conclusions or information contained in the autopsy reports or in the doctor's testimony and that neither the autopsy reports nor the doctor's testimony implicated the defendant in the homicides. Id. at 72. Given the foregoing, our supreme court concluded:

> We need not decide in this case whether autopsy reports are testimonial or whether a medical examiner may testify about an autopsy report produced by another pathologist who does not testify at trial. Instead we hold only that no clear rule of law was breached in this case by the admission of the autopsy reports or [the doctor's] testimony about them. Given the uncertainty that has existed in Confrontation Clause jurisprudence since Crawford, and in particular the lack of clarity regarding expert reports and testimony, which was actually exacerbated by the splintered decision in [Williams v. Illinois, 567 U.S. __, 132 S.

Ct. 2221 (2012)], we conclude that the defendant has failed to
establish that a clear and unequivocal rule of law was breached.

Id. (footnote omitted). Based upon the foregoing, the court held that plain error relief was not necessary to do substantial justice. Id.

In the instant case, the primary issue at trial was whether the appellant was the perpetrator. The autopsy report, which was prepared on July 6, 1995, revealed that the victim's death was attributable to blunt force trauma combined with sharp force injuries but did not reveal any forensic evidence tying a particular suspect to the murder. As we have noted, the appellant did not object to the admission of the autopsy report or challenge any of the findings contained in the report. Further, he failed to object to Dr. Deering's testimony. Therefore, we conclude that the appellant is not entitled to plain error relief.

### III. Conclusion

In sum, we conclude that the evidence is sufficient to sustain the appellant's conviction, that the trial court did not err by denying the appellant's motion to suppress, and that the appellant is not entitled to plain error relief regarding the admission of the autopsy report and Dr. Deering's testimony. Accordingly, the judgment of the trial court is affirmed.

_____
NORMA McGEE OGLE, JUDGE

-16-